UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KAUTHER BADR, | : | CIVIL ACTION NO.: |
| | : | 3:06-cv-01208-AHN |
| Plaintiff, | : | |
| | : | |
| V. | : | |
| | : | |
| LIBERTY MUTUAL GROUP, INC., | : | JULY 18, 2007 |
| | : | |
| Defendant. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO QUASH SUBPOENA DUCES TECUM AND FOR PROTECTIVE ORDER

Plaintiff Kauther Badr hereby moves to quash the subpoena duces tecum defendant Liberty Mutual Group, Inc. ("LM") is serving upon plaintiff's former employer, Enterprise Rent-A-Car ("Enterprise"). As set forth below, LM seeks documents from plaintiff's former employer, Enterprise, in an effort to discover whether plaintiff brought any claims or made any allegations similar to the harassment/retaliation claims she presently has asserted against defendant. Such a fishing expedition is not countenanced under the Federal rules of discovery, as efforts to prove "litigiousness" have been held to be wholly irrelevant and inadmissible in discrimination litigation. Because the subpoena is not designed to uncover, or lead to the discovery of, admissible evidence, the subpoena should be quashed and a protective order should issue precluding defendant's attempts to uncover evidence of prior complaints by plaintiff of discrimination against former employers.

## *FACTS*

This action by Ms. Kauther Badr seeks damages arising out of defendant's discrimination and retaliation during her employment in violation of Title VII, 29 U.S.C. §2000, 42 U.S.C. §1981, and Connecticut's Fair Employment Practices Act, 47a-60. Ms. Badr began her employment as a Sales Representative with defendant in its Stamford, Connecticut office on November 3, 2003. (Compl. ¶¶6-7.) Ms. Badr successfully completed her initial months of employment, but in late 2004, plaintiff's male coworkers in sales began making sexist and lewd remarks about her and other women. (Compl. ¶8.) These comments were made openly in the office and were often heard by Ms. Badr's supervisor. (Compl. ¶8.) Ms. Badr was subjected to several instances of overt harassment by these coworkers on the basis of her gender, religion and national origin. (Compl. ¶¶9-10, 13.) This included repeated allegations that Ms. Badr, by virtue of her religious beliefs and ethnicity, was a terrorist with family ties to terrorism. (Compl. ¶13.) Ms. Badr repeatedly complained to her superiors about the hostility of the work environment. (Compl. ¶16.) Despite her complaints, the harassment continued, and in emails in February through May 2005, plaintiff and several of her female coworkers complained of intimidation, personal attacks, threats and taunting. (Compl. ¶16.) In an email dated April 4, 2005 from Ms. Badr to Sabrina Allard, her immediate supervisor, and also to Dan Zbin, the Assistant Regional Sales Manager, she described the Stamford office as "war-like" and describes her actions in terms of survival. (Compl. ¶16.)

The inappropriate behavior of plaintiff's male coworkers was allowed to continue unabated, however, and Ms. Badr and other females in the Stamford office continued to complain to management. (Compl. ¶17.) Rather than taking the appropriate responsive action, these complaints were met with an attitude of annoyance. (Compl. ¶17.) In fact, complaints about the verbal attacks by these three coworkers led defendant's management to issue a written reprimand against Mr. Badr. (Compl. ¶25.)

Plaintiff sent an email to Ms. Allard, Mr. Zbin and James MacPhee, the defendant's Senior Vice President, in which she again complained of discriminatory conduct and the defendant's failure to respond to protect her. (Compl. ¶26.) Ultimately, as a direct result and consequence of her complaints, Ms. Badr was ultimately fired on June 1, 2005, ostensibly on the basis of performance and attendance issues. (Compl. ¶27.)

Prior to working for defendant, Ms. Badr worked for Enterprise from 2002 to November 2003, first as a sales associate and later as an assistant manager. During Ms. Badr's deposition, counsel for LM asked Ms. Badr the following:

> Q. Now, when you worked for Enterprise Rent-A-Car, did you bring any complaints against the company?
> A. No.
> Q. Did you discuss with [your supervisor] any complaints you planned to bring against the company?
> A. No.
> * * *
> Q. Do you recall discussing with anyone at Liberty Mutual the fact that you felt you were discriminated against as an employee at Enterprise Rent-A-Car?
>
> MR. LUCAS: Objection
>
> A. No.
> * * *
> Q. Okay. Do you – did you ever tell anybody at Liberty Mutual that you – that you knew somebody who had plans to sue Enterprise Rent-A-Car?
> A. No.
> Q. Okay. Did you ever tell anyone at Liberty Mutual that you knew somebody who planned to bring some kind of claim against Enterprise Rent-A-Car?
> A. No.
> Q. And did you ever tell anyone at Liberty Mutual that you knew somebody who was discriminated against by Enterprise Rent-A-Car?
> A. No.
> Q. Did you ever feel discriminated against in your position at Enterprise Rent-A-Car?
> A. No.

(Deposition of Kauther Badr at 29-32 (attached hereto as Exhibit A).) Despite the fact Ms. Badr denied making any complaints of discrimination or harassment as to any Enterprise manager or other employee, LM now seeks to compel the production from Enterprise of Ms. Badr's personnel file and other documents that may relate to any complaints by her or involving her. In attempting to discuss and limit the scope of this subpoena, the undersigned was informed the focus of the inquiry was to determine the veracity of plaintiff's responses during her deposition for impeachment purposes and specifically to determine whether she had in fact made any prior claims of discrimination or harassment. Presumably, if the discovery uncovered such a complaint, defendant intends that information to be used at trial to portray Ms. Badr as a manipulative complainer and/or at least a litigious and vociferous individual when it comes to civil rights.

As set forth below, such a baseless fishing expedition is not proper.

### *ARGUMENT*

Defendant seeks to compel Enterprise, through its subpoena duces tecum, to produce to it:

> "Any and all records relating to former employee Kauther Badr (approximate dates of employment in the Greenwich, CT office: May 2002 – October 2003), including but not limited to her: personnel file; any investigative file relating to complaints she lodged or complaints lodged about her; resume; background check documents; and notes from any interviews with or investigations relating to Ms. Bard."

(See Schedule A to Subpoena Duces Tecum, appended to defendant's Notice of Intent to Serve Subpoena Duces Tecum dated July 12, 2007.)

In support of this request, defendant stated to the undersigned it is seeking facts to impeach plaintiff's claim she did not lodge a complaint against her former employer some 4 years ago and to show she indeed made a claim similar to the current one against her previous employer. (See Affidavit of Counsel appended to plaintiff's Motion to Quash.) Even assuming the facts are as defendant suggests,

which plaintiff denies, this Circuit, in Outley v. City of New York, 837 F.2d 587, 593 (2d Cir. 1988), clearly indicates that such an effort is not reasonably calculated to lead to the discovery of admissible evidence. In Outley, plaintiff brought a civil rights action in which the jury found for the defendants. On appeal, the Second Circuit Court of Appeals found that the defendant's effort to paint plaintiff as a "chronic litigant" was improper. Defendants argued that its evidence of previous lawsuits by plaintiff was offered simply to impeach the plaintiff. The Second Circuit, rejecting this argument, stated that "[t]he charge of litigiousness is a serious one, likely to result in undue prejudice against the party charged, unless the previous claims made by the party are shown to have been fraudulent." Id. at 592.

The court in Outley analyzed the alternative argument by defendant that the evidence should be admissible under Rule 404(b) of the Federal Rules of Evidence as evidence of other crimes, wrongs or acts in order to prove motive, opportunity, intent and the like. The court, utilizing a Rule 404(b) analysis, held that "[t]he total impact of the evidence was to show that [plaintiff] is 'claim-minded' and that the claims before the court were just two more in a long line of lawsuits. Excepting this type of evidence from the general rule of 404(b) would permit an exception to swallow the rule." Id. at 593.

The Outlay court further held that:

Proof of [plaintiff's] prior lawsuits *might* be probative as to bias, but their existence alone is hardly conclusive on the issue. In order for a jury to properly consider them, the particular details of each action, and the extent to which the bringing of each action was justified, must be before the jury. Opening up this area thus invites detailed inquiries, denials, and explanations, likely to lead to multifariousness and a confusion of issues. As such, at least in this case, it is an area of examination better left closed.

Id. at 594-95; see also Mathis v. Phillips Chevrolet, Inc., 269 F3d 771, 775-76 ( 7th Cir. 2001) (holding error to admit evidence of prior lawsuits unless four-part test satisfied: (1) the evidence must establish something other than a propensity to sue; (2) the other act must be similar to the instant case and close in

time; (3) the evidence must be clear to the jury that the party committed the act in question; and (4) the prejudicial effect must not outweigh the probative effect.).

Accordingly, Outlay finds that to be admissible, evidence of prior lawsuits must first be shown to be unjustified (i.e., fraudulent), and then will only be admissible in the most rare of rare circumstances once the rabbit trail of a detailed factual inquiry is followed. In general, however, any evidence of litigiousness must be excluded. See also Constantino v. Herzog, M.D., 203 F.3d 164, 176 (2d Cir. 2000) (holding that examples of litigiousness are not appropriately placed before trier of fact).

Efforts at unfocused discovery of prior claims such as that propounded by defendant in this case are routinely rejected. For example, in Malloy v. Wayne Laboratories, Inc., 95 F.R.D. 488 (D.Mass. 1982), the court addressed the question of "whether information regarding any other lawsuits and/or employment discrimination charges which plaintiff *may* have filed against any of his prior employers is relevant to the subject matter of his lawsuit" and whether such information was discoverable. Id. at 489. Defendant sought such information claiming it was reasonably calculated to lead to the discovery of admissible evidence and properly within the scope of discovery. The court, noting the strong preference against such discovery and the chilling effect is has on a litigant's rights, stated that the defendant:

> [H]as put nothing before this Court to support its contention that [plaintiff] is either "hypersensitive" or "trigger-happy" other than [defendant's] "suspicion" that they *might* discover something to support that theory. This is a fishing expedition into irrelevant waters.

Id. at 490 (emphasis in original). The court then denied defendant's motion to compel such information. See also Hasbrouck v. Bank America Housing Services, 187 F.R.D. 453 (N.D. New York 1999) (ordering protective order on behalf of plaintiff precluding discovery sought by defendant seeking information about prior litigation and settlement with former employer).

In the instant case, defendant can offer absolutely no evidence that the plaintiff engaged in any wrongful or fraudulent conduct in any way linked to this action, and the broad and clearly over-expansive range of information sought demonstrates that they are merely on a fishing expedition. There is absolutely nothing tying any suspicion of alleged prior claims, demands, grievances, etc., with the present litigation, and no reason to explore the details of plaintiff's employment four years ago.

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that the subpoena served on Enterprise be quashed and that a protective order issue precluding defendant's attempts to uncover evidence of prior complaints by plaintiff of discrimination against former employers.

*PLAINTIFF*
*KAUTHER BADR*

By _____
Scott R. Lucas (ct00517)
Claire E. Ryan (ct22145)
*Attorneys for Plaintiff*
Martin, Lucas & Chioffi, LLP
177 Broad Street
Stamford, CT 06901
Phone: (203) 973-5200
Fax: (203) 973-5250
slucas@mlc-law.com
cryan@mlc-law.com

## **CERTIFICATE OF SERVICE**

This is to certify that on this 18th day of July, 2007, a copy of the foregoing was filed electronically [and served by mail on anyone unable to accept electronic filing]. Notice of this filing will be sent by e-mail to all parties, as listed below, by operation of the Court's electronic filing system [or by mail to anyone unable to accept electronic filing]. Parties may access this filing through the Court's system.

Margaret J. Strange, Esq.
Holly L. Cini, Esq.
Jackson Lewis LLP
90 State House Square, 8th Floor
Hartford, CT 06103
Phone: (860) 522-0404
Fax: (860) 247-1330
strangem@jacksonlewis.com
cinih@jacksonlewis.com

Scott R. Lucas (ct00517)
MARTIN, LUCAS & CHIOFFI, LLP
177 Broad Street
Stamford, CT 06901
Phone: (203) 973-5200
Fax: (203) 973-5250
slucas@mlc-law.com

**EXHIBIT A**

Page 1

1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
2
3
   * * * * * * * * * * * * * * *
4  KAUTHER BADR,                    )
                                    )
5              Plaintiff,           )
                                    )   Civil Action No.
6     -vs-                          )   3:06CV-01208 (AHN)
                                    )
7  LIBERTY MUTUAL GROUP, INC.,      )
                                    )
8              Defendant.           )
   * * * * * * * * * * * * * * *
9
10
11                    VOLUME I
12                  Pages 1 - 301
13
14
15        Deposition of KAUTHER BADR, taken before
   Bethany A. Carrier, a Court Reporter and Notary Public
16 within and for the State of Connecticut, pursuant to
   Notice and the Federal Rules of Civil Procedure, at the
17 offices of Jackson Lewis, 90 State House Square,
   Hartford, Connecticut, taken on May 2, 2007, commencing
18 at 10:04 a.m.
19
20
21
22
23          Bethany A. Carrier, LSR 071
            Brandon Smith Reporting Service
24                44 Capitol Avenue
            Hartford, Connecticut  06106
25                (860) 549-1850

Page 26

1        MR. LUCAS: Objection to form. Talking
2    about with her boyfriend?
3        MS. STRANGE: No. I'm talking about
4    ever.
5        MR. LUCAS: In her life?
6        MS. STRANGE: Yes.
7        MR. LUCAS: Objection.
8    A    Could you rephrase the question, please?
9    BY MS. STRANGE:
10   Q    Sure. You testified that you channeled your
11   aggressions and arguments towards your boyfriend.
12   A    Yes.
13   Q    Did you, in your life, did you ever have
14   problems in other situations where you mishandled or
15   did not channel your aggressions properly?
16       MR. LUCAS: Objection.
17   A    No.
18   BY MS. STRANGE:
19   Q    And how would you describe your
20   personality?
21   A    Outgoing. Independent. Before Liberty
22   Mutual I was very social. Now I would say I'm more
23   unsocial.
24   Q    And for the time period that you worked for
25   Liberty Mutual, did you have a problem being social

Page 27

1    with your coworkers?
2    A    No.
3    Q    Would it surprise you if your coworkers
4    described you as an angry and aggressive person when
5    you worked at Liberty Mutual?
6        MR. LUCAS: Objection.
7    A    Yes.
8    BY MS. STRANGE:
9    Q    So did you consider yourself angry and
10   aggressive when you worked at Liberty Mutual?
11   A    No.
12   Q    And where did you work before working at
13   Liberty Mutual?
14   A    Enterprise Rent-A-Car.
15   Q    And what was your position at Enterprise
16   Rent-A-Car?
17   A    My last position was an assistant manager in
18   the Greenwich, Connecticut office.
19   Q    Who did you report to?
20   A    John Miceli.
21   Q    And did you -- did you work with John Miceli
22   at Liberty Mutual as well?
23   A    Yes.
24   Q    Now, Enterprise Rent-A-Car what were your job
25   duties as assistant manager?

Page 28

1    A    To manage the office. To manage the fleet of
2    cars. Daily tasks as to activities answering the
3    phones, providing excellent customer service, training
4    employees.
5    Q    And when did you first become the assistant
6    manager at Enterprise Rent-A-Car?
7    A    I can't recall exactly. Let's see, I was in
8    Greenwich -- I can't recall exactly. I'm sorry.
9    Q    When did you graduate from college?
10   A    In 2002. May of 2002.
11   Q    And did you hold the position with Enterprise
12   Rent-A-Car when you graduated from college?
13   A    Not as an assistant manager, no.
14   Q    Did you work for Enterprise Rent-A-Car?
15   A    Yes.
16   Q    And did you work for them when you graduated
17   from college?
18   A    Yes.
19   Q    And what position did you hold then?
20   A    I was -- I can't recall the exact name, but I
21   was a sales associate or a -- I can't recall the exact
22   title.
23   Q    And where did you hold that position?
24   A    In Stamford.
25   Q    And then you said you were in Greenwich.

Page 29

1    When did you go to Greenwich?
2    A    I went from Stamford to Darien, then from
3    Darien to Greenwich. I can't recall the exact time
4    frames that I was in each office, but my shortest time
5    was in the Darien office.
6    Q    Now, when you worked for Enterprise
7    Rent-A-Car, did you bring any complaints against the
8    company?
9    A    No.
10   Q    Did you discuss with John Miceli any
11   complaints you planned to bring against the company?
12   A    No.
13   Q    And who is Rochelle Dalley?
14   A    Who?
15   Q    Who is --
16       MR. LUCAS: Rochelle.
17   BY MS. STRANGE:
18   Q    Rochelle Dalley.
19   A    She's a friend of mine.
20   Q    Did she work with you at Enterprise
21   Rent-A-Car?
22   A    Briefly we worked together, yes.
23   Q    And do you know whether she brought any
24   complaints again the company?
25   A    No.

### Page 30

1  Q  You say no. Is it that you don't know or
2  that she did not?
3  A  I'm not sure.
4  Q  Not sure. Okay. Do you recall discussing
5  with anybody at Liberty Mutual the fact that you felt
6  you were discriminated against at Enterprise
7  Rent-A-Car?
8        MR. LUCAS: Objection to form.
9        THE WITNESS: Can I answer?
10       MR. LUCAS: Was the question did she do
11 that, or as a predicate you have a presumption that
12 she did. So that's my objection.
13       MS. STRANGE: All right. I think you
14 can just object. If she doesn't understand, she can
15 tell me.
16       MR. LUCAS: I think you should ask
17 proper questions.
18       MS. STRANGE: You can note your
19 objection.
20 BY MS. STRANGE:
21 Q  Do you recall discussing with anyone at
22 Liberty Mutual the fact that you felt you were
23 discriminated against as an employee at Enterprise
24 Rent-A-Car?
25       MR. LUCAS: Objection.

### Page 31

1  A  No.
2  BY MS. STRANGE:
3  Q  And do you know, discussing with anyone at
4  Liberty Mutual, the fact that anybody else was
5  discriminated against at Enterprise Rent-A-Car?
6        MR. LUCAS: Same objection.
7  A  Could you rephrase the question, please?
8  BY MS. STRANGE:
9  Q  Sure. Is there something about the question
10 that you don't understand?
11 A  I'm not sure exactly what you're asking.
12 Q  Okay. Do you -- did you ever tell anybody at
13 Liberty Mutual that you -- that you knew somebody who
14 had plans to sue Enterprise Rent-A-Car?
15 A  No.
16 Q  Okay. Did you ever tell anyone at Liberty
17 Mutual that you knew somebody who planned to bring some
18 kind of claim against Enterprise Rent-A-Car?
19 A  No.
20 Q  And did you ever tell anyone at Liberty
21 Mutual that you knew somebody who was discriminated
22 against by Enterprise Rent-A-Car?
23 A  No.
24 Q  Did you ever feel discriminated against in
25 your position at Enterprise Rent-A-Car?

### Page 32

1  A  No.
2  Q  All right. Now, when did your employment at
3  Enterprise Rent-A-Car end?
4  A  October of 2003.
5  Q  And why did that end?
6  A  I opted to leave for a position at Liberty
7  Mutual.
8  Q  And how did you hear about the position at
9  Liberty Mutual?
10 A  I had rented a vehicle to Jeffrey Cybart, and
11 he at the time was working with Jet Blue and he
12 acquired a position with Liberty Mutual and he called
13 me after and referred me to the company.
14 Q  Now, did -- are you still in touch with
15 Jeffrey Cybart?
16 A  No.
17 Q  Are you still in touch with John Miceli?
18 A  Yes.
19 Q  When is the last time you spoke with him?
20 A  Four months ago perhaps.
21 Q  Have you discussed your -- this lawsuit with
22 him?
23 A  No.
24 Q  Why did you talk to him four months ago?
25 A  Because John also owns an independent

### Page 33

1  broker -- brokerage, and we are brokered with some of
2  the same companies. And we actually saw each other at
3  a meeting.
4  Q  And before that meeting, when is the last
5  time you saw him?
6  A  I can't recall. Saw him?
7  Q  Yes.
8  A  I can't recall.
9  Q  Who have you discussed your lawsuit against
10 Liberty Mutual with, other than your attorney?
11 A  My psychologist, my husband, my mother.
12 Q  And I asked you before about Rochelle Dalley.
13 Have you discussed your lawsuit against Liberty Mutual
14 with her?
15 A  Yes. Yes, I have.
16 Q  When is the last time you discussed it with
17 her?
18 A  I can't recall exactly. Like I said,
19 Rochelle and I are friends.
20 Q  What have you discussed with her regarding
21 your lawsuit?
22 A  Things that have happened in the office.
23 Q  Did you tell her you're going to testify here
24 today?
25 A  I told her, but it was a while ago. It

```
                                                          Page 299
 1                        J U R A T                 BAC
 2
 3
 4
 5
 6
 7
 8
 9                        [signature]
10
11                        KAUTHER BADR
12
13
14
15
16                        Subscribed to and sworn before me
17   on this  10th  day of  July                ,
18   2007.
19
20
21
22                        [signature] Clarie E. Rye
23
24   My Commission Expires:
25   Commissioner of Superior Court.
```

```
 1                    STATE OF CONNECTICUT

 2        I, Bethany A. Carrier, LSR 071, a Notary Public,

 3   duly commissioned and qualified in and for the State of

 4   Connecticut, do hereby certify that pursuant to Notice,

 5   there came before me on the 2nd day of May, 2007, the

 6   following-named person, to wit:  KAUTHER BADR, who was

 7   by me duly sworn to testify to the truth and nothing

 8   but the truth; that she was thereupon carefully

 9   examined upon her oath and her examination reduced to

10   writing under my supervision; that this deposition is a

11   true record of the testimony given by the witness.

12        I further certify that I am neither attorney nor

13   counsel for nor related to nor employed by any of the

14   parties to the action in which this deposition is

15   taken, and further that I am not a relative or employee

16   of any attorney or counsel employed by the parties

17   hereto, or financially interested in this action.

18        IN WITNESS THEREOF, I have hereunto set my hand
     this _____ day of _____, 2007.
19

20                       [signature: Bethany Carrier]

21                       _____
                              Bethany A. Carrier
22                              Notary Public

23
     My Commission Expires:
24   October 31, 2008

25
```